UNITED STATES FIDELITY & GUAR-
ANTY CORP., a Maryland
Corporation, Plaintiff,

v.

PUTZY, Leonard E. and McManus, Bri-
an, individually and as co-partners
d/b/a Professional Insurance Planners,
Inc.; Professional Insurance Planners,
Inc., a de facto Illinois corporation,
and Putzy, Jean M., Defendants.

No. 83 C 6083.

United States District Court,
N.D. Illinois, E.D.

June 7, 1985.

Leo Feldman, Arthur Raphael, Edward S. Margolis, Teller, Levit & Silvertrust, Chicago, Ill., for plaintiff.

Lawrence Kurbin, Tatel & Howlett, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

This diversity action involves a four count complaint seeking damages for insurance premiums due and unpaid. In Count I, plaintiff United States Fidelity & Guaranty Corp., a Maryland corporation, requests a judgment against Leonard E. Putzy, Jean M. Putzy, and Professional Insurance Planners, Inc., (hereafter PIPI) a de facto Illinois corporation, in the sum of $447,883.85. In Count II, plaintiff seeks a judgment in the same amount, plus punitive damages, against Leonard Putzy and Brian McManus as co-partners doing business as PIPI. Count III contains a prayer for judgment against Putzy and McManus as nondisclosed principals of PIPI. Finally, Count IV contains a prayer for judgment against Leonard Putzy and PIPI in the sum of $169,701.11, plus attorney's fees, pursuant to an agreement and note dated June 10, 1981. Judgment by default has been entered on Counts I and IV against defendants Leonard Putzy, Jean Putzy, and PIPI, and default has been entered as to the other counts. The matter is currently before the court on the cross-motions for summary judgment of plaintiff and defendant Brian McManus (hereafter defendant) on Counts II and III. For the reasons set forth herein, the court enters judgment for McManus on both counts.

## FACTUAL BACKGROUND

The following facts are undisputed. U.S. Fidelity & Guaranty Company is a Maryland Corporation licensed to do business in Illinois, with its principal place of business in Baltimore, Maryland. All defendants are Illinois citizens. On April 1, 1975, defendant Leonard Putzy (hereafter Putzy), then doing business as the L.E. Putzy In-surance Agency, entered into an Agency Agreement with plaintiff whereby he was granted authority to solicit and submit applications for U.S. Fidelity's insurance and bonds. Around that same time, Putzy retained an attorney for the purpose of incorporating an insurance agency to be known as Professional Insurance Planners, Inc. (PIPI). On April 24, 1975, a certificate of incorporation was issued to the company and recorded with the Secretary of State. On December 1, 1976, PIPI was involuntarily dissolved by the Secretary of State for failure to pay its franchise tax or file an annual report.

As of April 30, 1980, Putzy had a past due balance owing to plaintiff of $104,185 for premiums collected but not transmitted. This balance due grew to $171,430 by the end of May, and the parties met several times to work out payment. On June 10, 1980, Putzy entered into a new Agency Agreement with U.S. Fidelity on behalf of PIPI, a successor corporate agency. On June 12, 1980, Putzy, his wife Jean, Michael Wray, and Jim Peterson (potential purchasers of an interest in PIPI) signed a personal indemnity agreement to reimburse plaintiff against certain claims, and assigned all of PIPI's stock to plaintiff to secure the delinquent balances owed.

During this period, Putzy used letterhead reflecting both the names Professional Insurance Planners, Inc., and L.E. Putzy Insurance Agency. In 1980, Michael Wray purchased 10% of the agency. In order to maximize tax benefits stemming from PIPI's losses, Putzy directed his accountant, Richard Gallichio, to prepare multiple tax returns for the business. PIPI's corporate return reflected "no transactions." Gallichio also prepared a partnership tax return, however, for "Professional Insurance Planners" which reported the business's gross receipts and declared a loss.

On March 26, 1981, plaintiff's agent, Paul Jacob, suspended Putzy and PIPI's agency effective April 15, 1981. On April 16, 1981, Jacob wrote a memorandum to plaintiff's Vice-President indicating that

the suspension had been lifted, and recommending that the suspension continue to be lifted on the condition that PIPI obtain $75,000 in new capital to be paid directly to plaintiff on or before May 21, 1981. In that letter, Jacob recognized that PIPI's unstable financial condition presented a risk of unpaid premiums, but recommended the continuation because of the steady business.

The $75,000 capital was originally to be contributed $25,000 each by Putzy, Michael Wray, and Jim Peterson. The three parties also agreed to execute secured notes for the balance of the amounts owed. For reasons unexplained in the record before this court, the above deal fell through and Putzy appealed to Robert McManus, now deceased, and his son Brian for the money. The McManuses agreed to provide the capital as part of a stock purchase transaction. On May 7, 1981, McManus drew a check in the amount of $75,000, payable to Leonard Putzy and PIPI. The proceeds were accordingly turned over to plaintiff. On July 7, 1981, Putzy transferred 51% ownership of PIPI to the McManuses through a stock purchase agreement, a copy of which can no longer be found. Brian and Robert McManus thereby each became a 25.5% owner. Subsequent to the payment of the money, but before the stock purchase agreements were signed, McManus discussed the deal with his accountant, Paul Hoffman. Putzy had apparently advised both parties that PIPI was a Subchapter S corporation, with real estate holdings, and that its losses could therefore be deducted from personal income while the McManuses would have the security of owning land. At no time, however, has PIPI ever filed a tax return claiming Subchapter S status.

The only writing evidencing the above agreement is a stock certificate given to McManus and prepared by Paul Sheils, an attorney whom Putzy contacted to represent the McManuses in connection with the purchase. Sheils testified that he prepared the stock certificates as a new issue, based on Putzy's representations as to the number of outstanding shares. (Sheils Dep. at 47–48). Nothing was ever filed with the Secretary of State to record the issuance of these shares, and Sheils made no attempt to secure plaintiff's consent to the transfer or to ascertain that PIPI was a corporation in good standing. Sheils knew that Putzy had pledged 100% of PIPI's stock to U.S. Fidelity, but did not inform McManus of that fact.

From July 1981 to September 1983, plaintiff continued to do business with PIPI. The amount of unpaid premiums grew from $102,920.77 to $232,444.50. During that same period, neither Brian McManus nor Robert McManus took an active role in the day to day operations of PIPI. Also during that period, Richard Gallichio continued to prepare multiple tax returns for PIPI which attributed all PIPI's business transactions to the partnership Professional Insurance Planners and not to the corporation. Gallichio's 1981 financial statements for PIPI, the corporation, fully reflect all transactions and list $76,000 in shareholder equity. Gallichio testified that he "amended" the books of the business from a corporation to a partnership in December of 1981, but never discussed this decision with the McManuses. (Gallichio Dep. at 40–43).

Paul Hoffman prepared the 1981 personal income tax return of Brian McManus. Hoffman received PIPI's Schedule K–1 (the one prepared by Gallichio) directly from Leonard Putzy. That K–1 form listed PIPI as a partnership. Since the partnership and Subchapter S corporation forms are otherwise identical, however, Hoffman considered the use of a partnership form irrelevant and simply crossed out the numbers at the top of the form. Hoffman did not discuss Putzy's use of the partnership forms with McManus. McManus listed the PIPI losses on his 1981 tax returns as arising from operation of a Subchapter S corporation, not a partnership.

In April of 1983, Putzy asked McManus to sit in on a meeting with U.S. Fidelity representatives. McManus sat in on several meetings and learned for the first time of PIPI's liability to pay its extensive in-

debtedness to plaintiff. McManus also learned at this time that PIPI's corporate charter had been dissolved back in 1976, that Putzy had pledged all the stock and holdings of PIPI to plaintiff, and that plaintiff intended to hold McManus personally liable for any unsatisfied portion of the debt.

Sometime during the summer of 1983, McManus also learned that Putzy had been diverting funds from PIPI. In September 1983, McManus met with the representatives of his father's estate, and together they authorized Michael Wray, PIPI's account manager, to run the business. McManus informed Wray that PIPI was probably going to go bankrupt; Wray's job was therefore to wind up the business and ensure that no further funds were diverted.

## LEGAL DISCUSSION

Because jurisdiction in this case rests solely on diversity of citizenship, state law supplies the rule of decision. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The parties agree that Illinois law governs. Plaintiff argues that the undisputed facts show McManus liable at common law as a stockholder in a defective corporation, or, alternatively, as an undisclosed principal of PIPI. Defendant argues that the undisputed facts establish non-liability. The court will begin its discussion with plaintiff's claim against McManus as an undisclosed principal.

 It is Illinois law that a third-party who seeks recovery from both an agent and a previously undisclosed principal must elect from whom to take judgment. *General Refrigeration & Plumbing Co. v. Goodwill Industries*, 30 Ill.App.3d 1081, 333 N.E.2d 607, 613 (5th Dist.1975); *Vander Wagen Bros. v. Barnes*, 15 Ill.App.3d 550, 304 N.E.2d 663, 665 (1st Dist.1973). Although state doctrines of election of remedies are not always strictly followed in federal court, *see, e.g., Roberts v. Sears, Roebuck & Co.*, 573 F.2d 976, 984 (7th Cir.), *cert. denied*, 439 U.S. 860, 99 S.Ct. 179, 58 L.Ed.2d 168 (1978), federal courts have re-

spected the doctrine in the undisclosed agency situation, so long as a party proceeds to judgment against either the agent or the principal with full knowledge of the material facts underlying that decision. *Guy James Construction Co. v. Trinity Industries, Inc.*, 644 F.2d 525, 543 (5th Cir.1981); *Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.*, 630 F.2d 250, 274 (5th Cir.1980). In this case, plaintiff moved for a default judgment against PIPI in full knowledge that it had a potential claim against McManus and Putzy as undisclosed principals, and has already satisifed that judgment by seizing numerous PIPI assets. U.S. Fidelity's execution of judgment against PIPI, by Illinois law, discharged McManus from any liability under the theory alleged in Count III, even though PIPI's assets may in the end prove insufficient to satisfy its liability. *See Vander Wagen Bros.*, 304 N.E.2d at 665.

Defendant also argues that plaintiff's execution of judgment against PIPI as a de facto corporation under Count I bars it from proceeding against PIPI as a partnership. According to defendant, Counts I and II are alternative and inconsistent theories of recovery, since shareholders of a de facto corporation, unlike members of a partnership, may not be held personally liable for corporate debts in the absence of a positive statutory mandate. *Inter-Ocean Newspaper Co. v. Robertson*, 296 Ill. 92, 129 N.E. 523, 525 (1920). Defendant therefore argues that plaintiff's execution of judgment against PIPI as a de facto corporation constitutes an irrevocable election of remedies and a bar against its now contending that PIPI is in fact a partnership.

Unlike the undisclosed agency situation, where the Illinois courts have long found recovery against an agent to relieve the undisclosed principal from liability, it is unclear whether plaintiff's execution on PIPI's assets would be considered repugnant to its claims that PIPI lacks de facto corporate status. Judgment against PIPI was entered by default, with no litigation or discovery on the legal consequences attached to the term "de facto" as it related

to other issues before the court. Illinois courts have often refused to apply the doctrine of election where, as here, there is no threat of double recovery and the defendant has not changed its position in reliance on plaintiff's conduct. *Casati v. Aero Marine Management Co.*, 90 Ill.App.3d 530, 45 Ill.Dec. 789, 795, 413 N.E.2d 122, 128 (1st Dist.1981).

■ Defendant argues that plaintiff's default judgment against PIPI must operate as an estoppel or election because no enforceable judgment could have been entered without the court's implied finding that PIPI was indeed a legal entity subject to suit. Were it true that Illinois law does not consider partnerships suable entities, the court would find in defendant's favor on Count III. Defendant cites no authority regarding the status of partnerships as suable entities, however, and Illinois law appears to be otherwise. *See, e.g.*, Ill.Rev. Stat., ch. 110, ¶ 2–411. While the court concludes that plaintiff should have recognized the inconsistency in the theories underlying Counts II and III of its complaint, it would be unduly harsh to apply the doctrine of election of remedies where the judgment against PIPI was by default only and all of the facts underlying plaintiff's claim against PIPI as a de facto corporation would be reconcilable with its claim against PIPI as a partnership. The court therefore turns to the merits of Count III.

The Illinois courts have never squarely addressed the legal issue presented by this case: whether a stockholder who invests capital in a defective corporation with almost no semblance of corporate formality, may be held personally liable as a partner on corporate debts even though he conducted no business on the corporation's behalf.

Plaintiff argues that when the state of Illinois dissolved PIPI's charter, a sole proprietorship was created as a matter of law, and that this proprietorship became a partnership when McManus invested $37,500 in PIPI in order to purchase 25.5% of the business. Plaintiff further argues that application of de facto corporate status is inappropriate given PIPI's utter disregard of corporate formalities. Defendant argues, by contrast, that, under Illinois law, subscribers to a defective corporation, whether de facto or not, are subject to personal liability only if they have actually participated in the transactions underlying the corporation's debts.

Defendant has cited numerous Illinois cases for the proposition that, even in the absence of de facto status, a corporation's shareholders cannot be charged with corporate debts at common law. *Van Ameringen v. Cohen*, 254 Ill.App. 576, 583 (1st Dist.1929); *Churchill v. Thompson Electric Co.*, 119 Ill.App. 430, 434 (1st Dist. 1905); *Edwards v. Dettenmaier*, 88 Ill. App. 366, 369–70 (1st Dist.1899); *Edwards v. Cleveland Dryer Co.*, 83 Ill.App. 643, 655 (1st Dist.1899). Every one of these cases, however, addressed the statutory liability of stockholders under the old Business Corporation Act, (later Ill.Rev.Stat., ch. 32, § 157.150 (repealed 1984)), which expressly required active participation in the transaction creating a debt as a condition of liability. That statute was apparently not intended to change a creditor's common law right of action against the incorporators or other members of a business as partners. *M.H. Vestal Co. v. Robertson*, 277 Ill. 425, 115 N.E. 629, 631 (1917).[1] Defendant's cases are therefore

---

1. This conclusion is subject to reevaluation in light of *Steve's Equipment Service, Inc. v. Riebrandt*, 121 Ill.App.3d 66, 76 Ill.Dec. 612, 459 N.E.2d 21 (2d Dist.1984). In that case, the Illinois Appellate Court held that, under the Business Corporation Act, officers who contract on behalf of an involuntarily dissolved corporation are personally liable only if they knew or should have known of the dissolution. 459 N.E.2d at 24. The court rejected the plaintiff's argument for liability under common law agency principles on the ground that *Joseph T. Ryer-* *son & Son v. Shaw*, 277 Ill. 524, 531–32, 115 N.E. 650 (1917), the plaintiff's chief case, had been decided in the absence of a statute governing liability. The court remanded for a new trial, and held that the issue of liability would be resolved under the statute alone. This court finds *Steve's Equipment Service* persuasive evidence that an Illinois court sitting today might find the common law principles of *Bigelow* (which are somewhat different from those in *Ryerson*) altogether supplanted by statute.

not controlling to plaintiff's common law claim.

▮ The other cases cited by defendant are distinguishable in that every one involves a de facto corporation, that is, a corporation whose members in good faith supposed they were legally incorporated to do business and substantially complied with corporate formalities. Plaintiff does not question the rules that shareholders of a de facto corporation cannot be held liable as partners at common law, or that business creditors who deal with a de facto corporation as such are estopped from denying its existence. *See, e.g., Bushnell v. Consolidated Ice Machine Co.*, 138 Ill. 67, 75, 27 N.E. 596, 597 (1891); *Hoyt v. McCallum*, 102 Ill.App. 287, 290 (1st Dist.1902). In order to qualify as a de facto corporation, however, the members of the defective corporation must show a colorable or apparent compliance with the statutory formalities for creating such entities. *Inter-Ocean Newspaper Co. v. Robertson*, 296 Ill. 92, 129 N.E. 523, 524–25 (1920). Putzy's utter indifference to such formalities makes it apparent that PIPI is not a de facto corporation. The question therefore remains whether McManus is nonetheless protected due to his limited involvement in PIPI's business.

Illinois courts have long espoused the doctrine that members of a defective corporation may be held personally liable for the debts of the business under certain circumstances. The basis for this liability, however, is not always clear. Some cases suggest that unincorporated associations are partnerships, with all the members therefore personally liable. *M.H. Vestal Co. v. Robertson*, 277 Ill. 425, 115 N.E. 629 (1917); *Loverin v. McLaughlin*, 161 Ill. 417, 44 N.E. 99 (1896); *Bigelow v. Gregory*, 73 Ill. 197 (1874). Other cases, however, have stressed the principle of agency law that a party acting on behalf of a legally incompetent principal cannot avoid personal liability for his or her conduct. *Pilsen Brewing Co. v. Wallace*, 291 Ill. 59, 125 N.E. 714,

715 (1919); *Joseph T. Ryerson & Son v. Shaw*, 277 Ill. 524, 115 N.E. 650 (1917); *Seeberger v. McCormick*, 178 Ill. 404, 53 N.E. 340, *appeal dismissed*, 175 U.S. 274, 20 S.Ct. 128, 44 L.Ed. 161 (1899).

The distinction between these two lines of authority is crucial for the present case. Under the partnership theory, personal liability may attach whether or not the individual member actively participated in the transaction creating the debt. Under the agency theory, by contrast, only active participants in the firm's business are subject to personal liability. *See generally* Fletcher, *Cyclopedia of Corporations*, § 6648 (1984 ed.) The distinction has never been clarified under Illinois law, as in no case espousing the partnership theory did a party seek to hold a passive investor liable for corporate debts.

Plaintiff chiefly relies on the cases of *Bigelow v. Gregory*, 73 Ill. 197 (1874) and *Robbins v. Butler*, 24 Ill. 387 (1860) for the proposition that shareholders in a corporation which lacks both de jure and de facto status must be liable as partners for the corporation's debts. In *Bigelow*, however, the court applied this rule to the founding incorporators of a business, not subsequent shareholders. *Bigelow*, moreover, concerned a situation where the incorporators only attempted to file a corporate charter after the debt in question accrued. The court's refusal to sanction such a post-facto attempt to limit personal liability has little applicability to the present situation.

*Robbins* does contain language indicating that every member (i.e. stockholder) of an incompetent corporation may be held liable for the debts of the concern. However, in that case too, the defendants were the incorporating members of the business, and hence active participants in the overall concern if not in the particular transactions giving rise to the debt. At least two subsequent cases have referred in passing to *Bigelow* as creating a right of action against incorporators rather than shareholders, *M.H. Vestal Co. v. Robertson*, 115

However, in light of the unambiguous statement in *M.H. Vestal* indicating otherwise, the court will proceed to address defendant's liability under the common law.

N.E. at 631; *Bushnell v. Consolidated Ice Machine Co.*, 27 N.E. at 597, and it is therefore important to see how broadly *Bigelow* has been applied in later cases.

An examination of those subsequent cases reveals that plaintiff has exaggerated the breadth of that case. In *Bushnell v. Consolidated Ice Machine Co.*, 138 Ill. 67, 27 N.E. 596 (1891), the Illinois Supreme Court held that the rule of *Bigelow* could not apply to the case of de facto corporation, and rejected a stockholder's claim for an accounting against other stockholders as copartners. After remarking that partnerships can ordinarily be created by agreement only, the court briefly discussed the situations under which third parties may nonetheless sue incorporators on a partnership theory:

> This rule will not prevent the enforcement of liability against persons as partners when sued by third parties. Parties may so conduct themselves as to be liable to third persons as partners, when in fact no partnership exists as between themselves. The public are authorized to judge from appearances in professions, and are not absolutely bound to know the real facts, while the certain proof is positively known to the alleged parties. On this latter ground, parties who have attempted to organize a corporation, but have failed to comply with the law so as to perfect their incorporation, may be held liable as partners to creditors as in *Bigelow v. Gregory*, 73 Ill. 197. This liability rests on the doctrine of estoppel. When, however, even a creditor has dealt with the corporation as such, partnership liability cannot be enforced, even though the corporation has not been legally organized.... It is wholly unnecessary, however, in this case to determine when and under what circumstances third parties may proceed against incorporators acting against a defective or imperfect organization, as individuals or copartners.

27 N.E. at 597–98.

Subsequent cases further bear out the theory that only incorporators or others who actively conduct corporate business can be held liable for the debts of the corporation at common law. In *Seeberger v. McCormick*, 178 Ill. 404, 53 N.E. 340, *appeal dismissed*, 175 U.S. 274, 20 S.Ct. 128, 44 L.Ed. 1129 (1899), the court expressed the following opinion: "We are disposed to agree ... that the principle on which individuals so associated are held as partners is ... in acting for and in the name of a presumed corporation which has no corporate existence." 53 N.E. at 344. In *Pilsen Brewing Co. v. Wallace*, 291 Ill. 59, 125 N.E. 714 (1919), the Illinois Supreme Court again stated that non-statutory liability for corporate acts rests "on the rule of law that individuals [who] act under a corporate form ... when there is, in fact, no corporation ... have not thereby absolved themsevles from personal liability as partners." 125 N.E. at 715. While the above cases are not dispositive in the sense that all concerned de facto corporations, the recurrent language of the court lends strength to defendant's contention that the *Bigelow* theory has not been, and should not be, extended to the situation of a passive investor.

■ In the present case, it is undisputed that McManus did not participate in the transactions creating PIPI's debt to plaintiff. In fact, McManus did no more than purchase and hold PIPI stock throughout the period giving rise to PIPI's liability, even though he and his father collectively owned a majority share of the business. Plaintiff has pointed to no evidence suggesting that McManus got any benefit from his investment in PIPI other than the tax losses he claimed as a part owner in a Subchapter S corporation. More importantly, however, plaintiff has pointed to no affirmative act other than McManus's investment of $37,500 on which plaintiff relied in extending further business to Putzy. The proceeds of that check were promptly paid over to plaintiff, who then decided to continue doing business with Putzy without any expectation that it could go after McManus's assets in the event of default. Therefore, McManus's involvement with

PIPI did not fraudulently harm plaintiff, and the estoppel theory underlying *Bigelow* has no play.

One early case squarely supports defendant's position. In *Baker v. Bates-Street Shirt Co.*, 6 F.2d 854 (1st Cir.1925), appellants-defendants had undertaken to organize a corporation but failed to file the certificate for incorporation in the county registry. The trial court found that the corporation lacked both de jure and de facto corporate status, which findings were left undisturbed on appeal. The Court of Appeals, applying Massachusetts law, nonetheless reversed as to those defendants who had never participated in the transaction:

> Those who acted as agents for the inchoate corporation acted without a principal behind them, because there was no body corporate capable of appointing agents, and so became principals in the transaction. Their mistake, though shared by the defendant subscribers to the stock, does not make those subscribers partners in the business done.

*Id.* at 858 (quoting *Ward v. Brigham*, 127 Mass. 24, 27).

The Illinois courts, at least in the context of de facto corporations, have expressed similar concerns to those voiced by the First Circuit in *Baker*. In *Inter-Ocean Newspaper Co. v. Robertson*, 296 Ill. 92, 129 N.E. 523, the Illinois Supreme Court stated that parties who deal with a company as a corporation as such should generally not be allowed to claim more than they originally bargained for and hold the stockholders personally liable in the absence of some wrongdoing on the stockholders' parts. As the court noted,

> "It is by no means always practicable for purchasers of stock to examine every step taken in the organization of the corporation, and to hold them individually liable for its debts seems contrary to reason and justice, where there had been no fraud, but an honest effort had been made to effect a legal organization, and both the incorporators and the stockholders in good faith believed the corporation

legal, but some mistake or omission had been made such as here."

129 N.E. at 525–26.

Similarly, in *Hoyt v. McCallum*, 102 Ill. App. 287 (1st Dist.1902), the court expressed the opinion that to permit creditors to hold stockholders as liable, in the absence of deliberate fraud, is "to disregard the contract, representation and understanding under which credit was extended, and to give to creditors not only that for which they never contracted, but which it was definitely understood they were not to have." *Id.* at 291–92. The court expressed the opinion that the consequences of such a doctrine would be "most serious" given the practical impossibility for each stockholder to "know that all the steps necessary to the creation of a *de jure* corporation have been taken." *Id.*

■ Although the above cases dealt with corporations which in good faith dealt as such, the logic of those cases extends to the situation of a stockholder who negligently but unknowingly invests in a corporation which lacks even de facto status. The court assumes on the record before it that Putzy made no honest effort to effect a legal organization. Plaintiff has been unable, however, to show any active misconduct on McManus's part which would justify the extraordinary remedy of holding *him* liable for the business debts of PIPI. Absent any evidence that McManus knew of PIPI's prior dissolution, to hold McManus liable for PIPI's debts would be to give plaintiff more than it bargained for while denying McManus the shield against personal liability he thought he was entitled to as the purchaser of stock in a closed corporation.

■ Plaintiff has made some attempts to suggest misconduct on McManus's part by pointing out the questionable tax motives behind McManus's investment and his lack of concern for corporate formalities in purchasing stock. The inferences to be drawn from McManus's negligence or tax motives, however, do not make him a copartner doing business as PIPI, nor do they suggest

the sort of misconduct which would render equitable holding McManus liable for PIPI's debts. These debts were incurred by plaintiff in full knowledge that Putzy might divert funds and without any expectation of going after McManus's individual assets in the event of default.

■ Plaintiff has also attempted to color McManus's motives by alleging that he engaged in a stock watering scheme to obtain control of PIPI to the detriment of plaintiff's collateral. These allegations, however, are without any factual support in the record. Plaintiff has offered no evidence to rebut McManus's testimony that he did not know about Putzy's pledging of PIPI stock, and there is no factual basis for finding any detriment to plaintiff's collateral where the shares of stock sold to McManus have proven valueless, where McManus has reaped no profits from PIPI, and where plaintiff has been able to execute judgment on all of PIPI's assets.

The court therefore grants the defendant's motion for summary judgment on Counts II and III.

It is so ordered.